IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CAROL ALEXANDER, <br> as legal representative <br> of COREY JON WANTUCK, <br><br> Plaintiff, <br><br> v. <br><br> SUZUKI MOTOR OF AMERICA, INC. <br> and SUZUKI MOTOR CORPORATION, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 4:17-cv-01942-JCH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF J. STEPHEN DOLAN**

**I.     INTRODUCTION**

Defendants move to exclude the opinions of Plaintiff's vocational rehabilitation expert, J. Stephen Dolan ("Dolan") that Corey Wantuck (1) has a loss of earning capacity as high as $62,296, and (2) "no longer has access to the labor market." Dolan's "extreme highest number" ($62,296) for Mr. Wantuck's loss of earnings has no basis in fact and is entirely speculative. Dolan posits that this number is for someone *with a four-year bachelor's degree*. But, Mr. Wantuck does not have such a degree. An opinion like this—based on absolutely no factual basis—is speculative, cannot assist the jury, and must be excluded.

Dolan's opinion that Mr. Wantuck will never be able to work again should also be excluded. Instead of performing any independent testing to support his conclusion and its underlying bases (that Mr. Wantuck's memory loss, lack of social filter, and occasional anger mean he can never work again), Dolan relies only on the reports and opinions of Dr. Randall Benson and Dr. Robert Paul (two experts hired by Plaintiff—as opposed to Plaintiff's treating

7511634.1

physicians) and the subjective statements of Mr. Wantuck and his mother (the named Plaintiff). Ultimately, his opinion merely "parrots" the opinions of Drs. Benson and Paul and are unreliable, based only on *ipse dixit*, and must be excluded for failing to meet the standards for admissibility set forth in Federal Rule of Evidence 702 and *Daubert vs. Merrell Dow Pharms*, 509 U.S. 579 (1993), and its progeny.

## II-III.  FACTUAL BACKGROUND AND ADMISSIBILITY STANDARD

To avoid repetition, Defendants incorporate by reference Sections II (factual background) and III (admissibility standard for experts) of their Memorandum in Support of Motion to Exclude the Testimony of Plaintiff's Proposed Expert, Randall Nelson. The following details pertinent background for this motion.

Mr. Wantuck, who is now 29 years old, has a high school diploma. He graduated from New Horizons High School on May 15, 2009, as a Missouri Options Graduate, a program for students at risk of dropping out or not graduating.[1] Mr. Wantuck never took any college courses, and there is otherwise no evidence that he planned to obtain a college degree (let alone ever applied to a college before the crash). Ex. A, C. Wantuck Dep. at 22:1-19.

After high school, he joined the Army Reserves. Ex. A, C. Wantuck Dep. at 22:1-6; Ex. B, C. Alexander Dep. at 19:19-25. In his time in the Army Reserves, he worked as a mechanic that performed maintenance on vehicles. Ex. C, Dolan Dep. 56:9-18; 60:3-15. He was deployed once on active duty and worked as a guard. Ex. A, C. Wantuck Dep. at 31:2-21. He served in the Army in some capacity (reserves or active duty) until the date of the subject crash (October 26, 2013). Ex. B, C. Alexander Dep. at 20:1-22.

---

[1] *See* Memorandum in Support of Motion to Exclude Opinion of Dr. Randall Benson, at 3, n.2, for citations and more information regarding the Missouri Options Program.

While he was in the Army Reserves, Mr. Wantuck held a number of other jobs.  He worked as a car salesman at St. Charles Automotive for eight months (August 1, 2010 to April 1, 2011).  Ex. C, Dolan Dep. at 47:9-12; 57:5-7.  He made $7,334.96 in 2010 and $4,442.47 in 2011. Ex. D, Dolan Report at 3 (marked as Ex. 10 to Dolan Dep.) (citing W-2s).  For one month in 2013 (January 23, 2013 to February 21, 2013), Mr. Wantuck worked as a cashier at Victory Lane, a convenience store, where he likely made around $10 per hour.  Ex. __, Dolan Dep. at 47:3-6; 53:11-20.  At the time of the 10/26/13 crash, Mr. Wantuck was working at Automotive Products Consultants (APC) for eight months.  Ex. A, C. Wantuck Dep. at 29:7-10.  His work at APC consisted of selling car warranty insurance over the telephone.  Ex. C, Dolan Dep. at 47:21-24; Ex. A, C. Wantuck Dep. at 36:5-20.  His W-2 for APC shows that he made $27,683.70 in 2013. *See* C. Wantuck's 2013 W-2 (produced by Plaintiff).  While working at APC (prior to the crash), Mr. Wantuck received eight warning notices for work quality or tardiness.  Ex. C, Dolan Dep. at 48:25 – 50:12; *see also* Ex. 13 to Dolan Dep. (APC warning notices).

Since his crash, Mr. Wantuck has taken steps toward getting back into the workforce.  He has worked with the Ralls County Health Department and Community Opportunities (a vocational rehabilitation center).  Ex. B, C. Alexander Dep. at 39:21 – 40:13.  In 2017, he made the decision to stop working with Community Opportunities to focus on studying for an insurance test so that he could attempt to return to APC.  Ex. B, C. Alexander Dep. at 40:10-17; Ex. A, C. Wantuck Dep. at 30:3-9.  On January 15, 2018, he obtained his insurance producer license after a lot of studying and unsuccessful attempts at passing.  Ex. A, C. Wantuck Dep. at 24:23 – 25:5.  He returned to Community Opportunities in August 2018 but, shortly thereafter, exited the program at the advice of his attorneys.  *See* Ex. E, Community Opportunities Records (COMMOPPS000332-333).

### IV.   OPINIONS OF J. STEPHEN DOLAN

Dolan performed an "assessment of the extent to which [Mr. Wantuck's] resulting functional limitations erode his access to the labor market, if in fact they do." Ex. D, Dolan Report at 2. Dolan claims to have used "a peer reviewed vocational assessment tool" in his *two-hour* meeting with Mr. Wantuck. *Id*. Essentially, Dolan asked Mr. Wantuck a series of questions about his background (e.g., education history, work history, medical history, functional limitation, daily activities). Mr. Wantuck's mother, Carol Alexander, was also present and assisted in providing information. *Id*. Other than that two hour meeting, Dolan has not met or spoken with Mr. Wantuck or his mother to get information to support his opinions. Ex. C, Dolan Dep. at 9:17-21.

Dolan's first opinion is that Mr. Wantuck "no longer has access to the labor market" (i.e., he can never work again). Specifically, Dolan's Report states:

> LABOR MARKET ACCESS: Based on the limitations delineated by both Dr. Paul and Dr. Benson Mr. Wantuck no longer has access to the labor market. The biggest problem vocationally are his impaired short-term memory (he would frequently not remember supervisors' instructions) and his lack of social filter and loss of temper leading to violent verbalization or behavior.

Ex. D, Dolan Report at 8. Dolan has three bases for his opinion that Mr. Wantuck no longer has access to the labor market: (1) Dr. Randall Benson's (neurology) report; (2) Dr. Robert Paul's (neuropsychology) report; and (3) information he obtained from Mr. Wantuck and his mother during the two-hour meeting on March 21, 2019. Ex. C, Dolan Dep. at 100:24 – 101:5; 103:17 – 104:10.

Dolan's second opinion is that he "project[s] Mr. Wantuck's loss of earning capacity to be between $29,770 and $62,296 per year in today's dollars, not considering inflation or benefits." Ex. D, Dolan Report at 9. He basis this projection on (a) data from

the U.S Department of Labor for "civilian yearly pay" for jobs Mr. Wantuck previously held and (b) "average pay per year nationally by education level." Ex. D, Dolan Report at 8-9. The low end of is projection ($29,770) is for a retail/salesperson in the St. Louis area. Ex. C, Dolan Dep. at 110:11-15. The high end ($62,296) is based on the Department of Labor national average for someone with a four-year bachelor's degree. Ex. C, Dolan Dep. at 109:9 – 110:5.

## V. ARGUMENT

**A.     Dolan's opinion that the high end of Mr. Wantuck's prospective earnings is $62,296 should be excluded as it is speculative and will not assist the jury because it is unsupported by any facts.**

The entire basis for Dolan's "extreme highest number" of $62,296 is the U.S. Department of Labor national average for someone *with a four-year bachelor's degree*. Mr. Wantuck does not have such a degree. In fact, he has never taken any college courses and there is otherwise no evidence that he planned to obtain a four-year college degree at any time (or even applied to a college prior to the crash). Rather, Mr. Wantuck obtained a high school diploma through the Missouri Options program and, thereafter, enlisted in the Army and later sought employment without ever obtaining a four-year college degree.

Dolan's opinion is, therefore, speculative, lacks any factual basis, and cannot assist the jury in determining any issue in this case. *See Cole Homier Distrib. Co., Inc.*, 599 F.3d 856, 865 (8th Cir. 2010) (affirming exclusion of expert report that was factually flawed because expert unaware or disregarded certain facts meaning "it can offer no assistance to the jury"); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006) ("To show that expert testimony is relevant, the proponent must show that the reasoning or methodology in question is applied properly to the facts in issue."); *see also Mallicoat v. Archer-Daniels-Midland Co.*, 2013 WL

6000097, at *3 (E.D. Mo. Nov. 12, 2013) (citations and quotations omitted) ("Departures from actual pre-injury earnings must be justified and cannot be unduly speculative.  Like all expert testimony, an expert witness's calculations of future earning capacity are inadmissible under Federal Rule of Evidence 702 if based on unsupported speculation.  Further, such testimony should be excluded if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects … or facts that are clearly contradicted by the evidence." (citations omitted)).[2]  Dolan's loss of earning capacity of $62,296 should be excluded.

**B.     Dolan's opinion that Mr. Wantuck "no longer has access to the labor market" should be excluded because it is unreliable and merely repeats opinions of Plaintiff's other experts.**

"A vocational rehabilitationist assesses the extent of an individual's disability, evaluates how the disability affects the individual's employment opportunities, and assists the individual's re-entry into the labor market." *Elcock v. Kmart Corp.*, 233 F.3d 734, 740 (3d Cir. 2000).  Courts have recognized that *Daubert* applies to the work of a vocational rehabilitation expert:

> Vocational rehabilitation is a social science that does not exactly mirror the fundamental precepts of the so-called harder sciences.  However, the gist of the … *Daubert* factors are nonetheless implicated in this case.  Just as a scientist would want to duplicate the outcome when evaluating a colleague's claim that he had developed a technique for cold fusion, a vocational rehabilitationist assessing [the proposed vocational expert's] disability determination would want to test the underlying hypotheses and review the standards controlling the technique's operation in an attempt to reproduce the results originally generated.

*Id*. at 747.

Dolan opined that Mr. Wantuck "no longer has access to the labor market" for three reasons: (1) his memory is awful; (2) he has no social filter; and (3) he occasionally gets angry:

---

[2] Dolan's numbers are also speculative in that he did not rely on any of Mr. Wantuck's W-2s to support his projected earnings for him.  *See* Ex. C, Dolan Dep. at 67:17-21.  Indeed, while the W-2 for 2013 shows that Mr. Wantuck made just under $28,000 that year with his work for APC, Dolan did not take that into account in his loss of earning capacity opinion.

> My opinion is that he's not going to be able to [re-emerge into the competitive market]. And the reason is that he's – his memory is awful. He would not be able to remember supervisors' instructions. He has – he has no social filter, so his behavior is, at times, likely to be unacceptable in the workplace. And he, at times, becomes angry, according to his mother, becomes violently angry, either verbally violent or physically violent by throwing things. None of those things are going to be appropriate or accepted or tolerated in the workplace.

Ex. C, Dolan Dep. at 123:21 – 124:6. Dolan's *only* bases for his opinion are: (1) his 2-hour interview of Mr. Wantuck and his mother; and (2) the reports by Plaintiff's medical experts Drs. Benson and Paul. Ex. C, Dolan Dep. at 100:24 – 101:5; 103:17 – 104:10.

Dolan's opinion that Mr. Wantuck "no longer has access to the labor market" is inadmissible for two reasons. First, it is unreliable and speculative because Dolan did not perform any independent testing that explains in any way how he determined that Mr. Wantuck suffers from memory issues, a lack of a social filter, or anger, or how these three issues preclude him from the workplace for the rest of his life. Second, because he did no independent analysis, Dolan merely "parrots" the opinions of plaintiff's hired medical experts (as opposed to treaters) as his own opinion.

    1.    <u>Dolan did not perform any testing</u>.

Dolan readily admits that—although his vocational analysis normally includes testing—he performed no testing on Mr. Wantuck. *Id*. at 87:12-15. He did no test to analyze Mr. Wantuck's memory; he did no test to analyze Mr. Wantuck's social filter; and he did no test to analyze Mr. Wantuck's occasional anger. *Id*.; *see also id*. at 125:14-16 (did not perform "any tests … to determine his ability to recall anything"). Under *Daubert*, a vocational rehabilitation expert's opinion must be based on testable hypotheses. *See Elcock*, 244 F.3d at 747. Without testing Mr. Wantuck's memory, social filter, and anger—the *only reasons* Dolan believes Mr. Wantuck is unable to work—there is no way to determine how Dolan arrived at his conclusion.

*Elcock* is instructive.  There, the vocational rehabilitation expert opined that the plaintiff "was between 50 and 60 percent vocationally disabled and that this disability was permanent." *Elcock*, 233 F.3d at 740.  The purported expert performed work similar to Dolan's work in this case, describing his methodology:

> You take into comparison her education, her intelligence, her aptitude, her previous work experience and her medical injuries, what she says, she would like to do, what her desires are as a person, her temperaments, whether she likes working by herself or she likes working with groups of people, whether she likes working on detailed stuff or she doesn't like working on detailed things because those are important, and her limitations as she states them, not only the medical findings but her limitations as she states them.  So when you take all of those things together the closest I could come to it as a 50 to 60 percent disability.

*Id*. at 747; *compare with* Ex. C, Dolan Dep. at 92:8 – 94:14 (detailing Dolan's methodology to include, among other things, a meeting with the person, obtaining background information regarding education, work history, medical history, limitations).  The conclusion that the plaintiff was "50 to 60 percent vocationally disabled" appeared connected only to the *ipse dixit* of the expert.  *See Elcock*, 244 F.3d at 747.  The Third Circuit cautioned that without a testable hypothesis or explanation of controlling standards, the method becomes "subjective and unreproducible."  *Id*. at 747-48.  This would mean that the "method was unreliable and therefore his opinion would not 'assist the trier of fact to understand the evidence or to determine a fact in issue ….'"  *Id*. at 748 (quoting Fed. R. Evid. 702)).[3]

Here, because Dolan has failed to test any of the underlying hypotheses he claims support his opinion that Mr. Wantuck "no longer has access to the labor market," this opinion is unreliable, speculative, and based on *ipse dixit*.  Further, because Dolan performed no testing and, apart from his own subjective review of records and the subjective statements of Mr.

---

[3] In *Elcock*, the Third Circuit remanded the case to the district court for a *Daubert* hearing to more fully address these issues.

Wantuck and his mother, provides no explanation of his underlying methodology, his opinion will not assist the jury. *See, e.g., Weir Pioneer Hi-Bred Intern., Inc.*, 2000 WL 35533101, at *4 (N.D. Iowa 2000) (excluding vocational rehabilitation expert opining where, among other things, "conclusions appear to be completely subjective, based upon his review of certain records and consideration of [the plaintiff's] subjective opinions"). This opinion should be excluded.[4]

    2.    <u>Dolan merely "parrots" the opinions of Dr. Benson and Dr. Paul</u>

Dolan testified that his opinion that Mr. Wantuck "no longer has access to the labor market" is based, in large part, on the opinions and reports of Drs. Benson and Paul. Dolan has never spoken to Dr. Paul or Dr. Benson. Ex. C, Dolan Dep. at 85:16-20. He says that "the reason he used their opinions is that [he] agree[s] with them." *Id*. at 104:1-10. Dolan provided his own summaries of the opinions proffered by Drs. Paul and Benson:

> The most recent neuropsychological is from Dr. Paul and is dated 3/21/19. The doctor said: "The evaluation revealed significant impairment in general cognition function and moderate to severe impairment on multiple tests across cognitive domains." He went on to specify significant impairment in attention and working memory; psychomotor speed; information processing speed; motor skills; and profound learning and memory impairment. The evaluation indicated that Mr. Wantuck is not capable of living independently. It further showed that return to employment is not a reasonable goal given the severity of, and persistence of, cognitive impairment. The cognitive impairment will like become worse after his fourth decade of life.
>
> Dr. Benson's evaluation done in November 2018 included brain scanning. That revealed multiple scattered hyperintensities in the right frontal deep white matter, left parietal deep white matter and encephalomalacia (softening) bilaterally in the anterior-superior aspect of the frontal deep white matter.
>
> Dr. Benson concluded that Mr. Wantuck's current state of severe cognitive deficits with slowed psychomotor processing, impaired verbal fluency, memory deficits and executive dysfunction are permanent. He is precluded from being

---

[4] Without testing, the court cannot determine the potential error rate of that opinion—another factor under *Daubert*. *See In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 448 (S.D.N.Y. 2016) (purported expert's theory had not been tested "and therefore had no known error rate"); *Edwards v. Safety-Kleen Corp.*, 61 F. Supp. 2d 1354, 1360 (S.D. Fla. 1999).

> independent and self-sufficient.  He is at much greater risk than normal of developing dementia.  He is significant risk of another brain injury due to his executive dysfunction and impaired judgment and insight as well as because he has no had two brain injuries.

See Ex. D, Dolan Report, at 4-5 ("Functional Limitations").  These are medical opinions.  Dolan is not a medical doctor and admits that he not is not qualified to give such medical opinions.  See Ex. C, Dolan Dep. at 8:14 – 9:2; 103:1-5.  In this respect, he cannot "agree" with these opinions; he has no qualifications to come to the conclusions of a neurologist or neuropsychologist.  See Simon v. Select Comfort Retail Corp., 2016 WL 160643, at *4 (E.D. Mo. Jan. 14, 2016) ("An expert's opinion must be based upon his or her own application of principles within his [or] her expertise to the facts of the case.") (citation omitted)).

Attempting to fit medical opinions into his analysis, Dolan testified that he believes the opinions of Drs. Benson and Paul are "vocationally relevant" because of Mr. Wantuck's "short-term memory loss and lack of social filter and loss of temper." Ex. C, Dolan Dep. at 104:1-14.  Dolan cannot, however, merely rely on other experts' work in fields in which he is unqualified as a substitute for performing his own analysis.  See, e.g., Simon, 2016 WL 160643, at *4 ("Here, [the purported expert] did not merely use the … report as data upon which an expert in her own field would reasonably rely to form an opinion, but rather, adopted wholesale the opinion of another expert." (citation omitted)).  But that is what he has done.  For instance, he did not perform any tests because Mr. Wantuck "had been tested by a neuropsychologist." Ex. C, Dolan Dep. at 87:12-15.  And, he did not perform "research into looking at potential jobs that [Mr. Wantuck] should pursue or could pursue[]  [because] [b]ased on the report from Dr. Benson and the report from Dr. Paul, that [research] would be a waste of time." Id. at 100:11-15.

"Rule 703 does not permit an expert to simply 'parrot' the opinions of other experts." Simon, 2016 WL 160643, at *4 (citation omitted).  Without any reliable independent vocational

analysis, Dolan's opinion that "[b]ased on the limitation delineated by both Dr. Paul and Dr. Benson Mr. Wantuck no longer has access to the labor market" simply "parrots" the conclusions reached Dr. Benson and Dr. Paul.  For this reason, it should be excluded.  *See id*. ("Absent any independent analysis, the Court finds [the proffered expert's] opinion on this matter is unreliable.").

## VI.    CONCLUSION

For all these reasons, this Court should exclude J. Stephen Dolan's opinions that Mr. Wantuck (1) has a loss of earning capacity as high as $62,296, and (2) "no longer has access to the labor market."

Respectfully submitted,

THOMPSON COBURN LLP

By:  /s/ *Carl J. Pesce*
  Carl J. Pesce, #39727MO
  Benjamin S. Harner, #65950MO
  One US Bank Plaza
  St. Louis, Missouri  63101
  (314) 552-6000
  (314) 552-7000 (fax)
  cpesce@thompsoncoburn.com
  bharner@thompsoncoburn.com

  Randall R. Riggs (admitted pro hac vice)
  Jeffrey J. Mortier (admitted pro hac vice)
  FIRST BROWN TODD LLC
  201 N. Illinois St., Suite 1900
  P.O. Box 44961
  Indianapolis, Indiana 46244
  rriggs@fbtlaw.com
  jmortier@fbtlaw.com

  Attorneys for Defendants,
  Suzuki Motor of America, Inc. and Suzuki Motor Corporation

- 12 -

## CERTIFICATE OF SERVICE

 The undersigned hereby certifies that the foregoing was electronically filed on January 27, 2020, to be served via the Court's electronic filing system to all counsel of record.

James Lemonds
Brown & Crouppen, P.C.
211 North Broadway, Suite 1600
St. Louis, MO 63102
jiml@getbc.com

Tyler S. Thompson
Dolt, Thompson, Shepherd
& Conway, PSC
13800 Lake Point Circle
Louisville, KY 40223US
tthompson@kytrial.com

Anthony P. Ellis
Ellis Law Group, PLLC
517 West Ormsby Avenue
Louisville, KY 40203
aellis@theellislawgroup.com

Attorneys for Plaintiff

             /s/ *Carl J. Pesce*